## Edwin Lacey et al. v. State Banking Board et al.

No. 4958.   Decided December 12, 1928.
(11 S. W., 2d Series, 496.)

*F. H. Prendergast, Edwin Lacey,* and *Young & Stinchcomb,* for relators.

Art. 448 of Rev. Stats. commands the Commissioner to pay the depositors at once out of the money available and unpaid balance by a charge against the Guaranty Fund, so then when the bank failed, the depositors in that bank had an immediate vested right in the funds to be collected by the liquidating agent, and the guaranteed depositors had an immediate vested right in the amount then on hand in the Guaranty Fund, and the laws' necessary delay is the only thing that prevented an immediate payment.

The emergency fund that was collected later was collected for the purpose of paying the guaranteed depositors in this Longview Bank, and therefore, became designated for that purpose.

*Claude Pollard,* Attorney-General, *C. W. Truehart,* Assistant, *Jno. W. Goodwin,* and *L. C. Sutton,* for respondents.

Article 448 provides that if the Commissioner takes possession of a Guaranty Fund Bank, its depositors shall be paid in full out of the cash on hand that can be made immediately available if sufficient (meaning, of course, the cash in said failing bank), and, "if not sufficient, the remainder shall be paid out of the depositor's Guaranty Fund, through the Banking Board." There is here no *requirement,* express or implied, that the entire balance due the protected depositors of the bank taken into possession should be paid out of the Guaranty Fund in preference to or to the exclusion of the protected depositors of the Guaranty Fund Banks subsequently failing.

We contend that, in the absence of any guidance in the terms of the law, or otherwise, the ends and purposes of this Trust Fund would be best subserved by equal distribution of the Fund on hand among all of its beneficiaries. This is equity. This is common-sense fairness, as it seems to us. Why, it may well be asked, should the creditors of a bank be entitled to take advantage of its dereliction through failure, to the prejudice of creditors of other banks that have carried on? If all are protected creditors under the Guaranty Fund Law, then all should be equally protected by the Guaranty Fund.

If the Guaranty Fund Law had not been repealed, if the plan was still in operation, it might with reason be argued that the Banking Board should discharge the Guaranty Fund debt to the protected depositors of each of these banks in sequence as they fail.

The claims of the protected depositors of the banks failing after the Longview Bank were at the time of the failure of the Longview Bank somewhat in the same attitude as the claims of the holders of unmatured certificates in a mutual benefit association, and it is held that such claims are entitled to prorate equally with matured claims of the same kind. Youth's Temple v. Laddy, 76 N. W. (Minn.), 59, 60; In re Tonti's Estate, 34 Atl. (Pa.), 441; In re Guardian's Estate, 28 Atl. (Pa.), 482. In Williams v. Fund, 44 N. E. (Mass.), 342, it is said: "The rule of distribution in winding up a company of this sort (mutual benefit association) necessarily is different from the order of payment made by it when a going concern."

Mr. Judge LEDDY delivered the opinion of the Commission of Appeals, Section B.

The nature of this proceeding will fully appear from the pleadings of the parties, which, being short, are here set out:

"Now comes Edwin Lacy of Gregg County, Texas, as executor of the Gibson estate, who holds a claim for the sum of $132.03, which has been approved against the Guaranty Fund. Mrs. Sam McFarland, who holds a claim for the sum of $4562.37, joined by her husband, Sam McFarland; M. T. Flanagan, who holds a claim in the sum of $1576.24, and doing business in the name of the Rembert Theater; and Mrs. J. H. (Mollie) Fisher, who holds a claim for the sum of $11,001.70, joined by her husband, J. H. Fisher, all of Gregg County, Texas, and all of said claims having been approved against the Guaranty Fund.

"Complaining of Claude Pollard as Attorney General of Texas and ex officio member of the Banking Board.

"And complaining of W. Gregory Hatcher as the Treasurer of the State of Texas and ex officio member of the Banking Board.

"And complaining of James Shaw, Bank Commissioner and ex officio member of the Banking Board. And this suit is brought against them as composing the Banking Board of Texas. Each of defendants resides and has his place of business and office in Travis County, Texas. Also complaining of James Shaw, Banking Commissioner, of the State of Texas and Receiver of the Commercial Guaranty State Bank of Longview, and complaining of said James Shaw as receiver of the eight Banks hereafter named.

"And shows to the Court that the Commercial Guaranty State Bank of Longview, Texas, is a member of the Guaranty Fund Banking Business.

"And having become insolvent and unable to longer carry on its affairs as a bank, did on the 29th day of September, 1926, voluntarily cease to do business and went into the hands of the Banking Commissioner for the purpose of liquidation. That plaintiffs were depositors of unsecured non-interest bearing deposits and the same have been approved as claims against the Guaranty Fund as follows:

"Edwin Lacy ...........................$   132.03
Mrs. Sam McFarland ...................  4,562.37
M. T. Flanagan, doing business in the name
    of Rembert Theater ...............  1,576.24
Mrs. J. H. (Mollie) Fisher ...........  11,001.70

"Shows to the Court that there is in the hands of the Banking Board the sum of $437,169.42, subject to be applied and paid to the depositors of said Bank whose deposits were non-interest bearing and unsecured.

"That there are claims of depositors of the Longview Bank which have been approved against the Guaranty Fund to the amount of approximately $400,000.00; plaintiffs are not informed of the exact amount.

"Soon after the failure of the Longview Bank, the Banking Commissioner made one or more assessments against the Banks in Texas that were members of the Guaranty System and ordered them to pay to the Banking Board the amount due from each Bank.

"This was done and the amount collected was, and is $137,169.32.

"That at the time the Longview Bank failed there was in the Guaranty Fund the sum of $300,000.00 which was at once subject to be paid to the guaranteed depositors of said Bank and said Bank guaranteed depositors had then a vested right to have said fund so paid to them.

"That after the failure of said Bank two emergency assessments were made by the Banking Board to pay the guaranteed depositors of said Bank.

"One producing ........................$ 60,708.76
"One producing ........................  76,460.66

"Total  ...............................  137,169.42
"To which add ........................  300,000.00

$437,169.42

"This amount should be applied to pay the guaranteed depositors of said Bank.

"That since the failure of the Longview Bank on the 29th of September, 1926, other Banks belonging to the Guaranty System have failed and left depositors who have claims in the aggregate to be approved against the Guaranty Fund of many thousand dollars.

"The following list shows the names of the Banks failing since the failure of the Commercial Guaranty State Bank of Longview on September 29, 1926, the place where located and the date of the failure of each, and each of said Banks were operating under the Guaranty Fund System.

"List of Guaranty Fund Banks failing subsequent to the Commercial Guaranty Bank, Longview, Texas, September 29th, 1926.

| Date | Corporate Name | Location |
|---|---|---|
| Oct. 31/26 | Commercial State Bank, | Cisco, Texas |
| Nov. 3/26 | Altoga State Bank, | Altoga, Texas |
| Nov. 16/26 | Farmers & Merchants St. Bk., | Mt. Calm, Texas |
| Nov. 26/26 | Guaranty State Bank, Trinidad, | Trinidad, Texas |
| Dec. 2/26 | Farmers State Bank, | Kemp, Texas |
| Dec. 14/26 | Guaranty State Bank, | Gunter, Texas |
| Jan. 3/27 | Addison State Bank, | Addison, Texas |
| Jan. 7/27 | First State Bank of Belton, | Belton, Texas |

"That the defendant, James Shaw, is in control and possession of each of said Banks as Receiver and as such has authority under the law to adjust and settle its affairs, and as such Receiver he is made defendant in this cause.

"The Banking Board have failed and refused to declare a dividend and pay the money to the guaranteed depositors of the Longview Bank and are now threatening to declare a dividend and pay out the money on hand pro rata to the guaranteed depositors of the Longview Bank, together with the guaranteed depositors of all the other Banks that have failed since the failure of the Longview Bank on September 29, 1926, and unless restrained, will do so.

"If the guaranteed depositors of the Longview Bank are forced to prorate with the depositors of Banks which have failed since it failed, they will only receive about thirty per cent of their debts, and if they do not have to prorate, they will be paid in full.

"When the Banking Commissioner made an assessment on the Banks belonging to the Guaranty System to pay the protected depositors of the Longview Bank and collected the money, then the guaranteed depositors of the Longview Bank had a vested right to have the money so collected thus applied.

"The law provides that the Banking Commissioner shall pay the dividends under the direction of the Banking Board; in case of doubt or of conflicting claims, the Board may apply to the District Court or the Judge for instruction. (Rev. Stats. Art. 467.) The Board has failed and refused to make such application though more than a year has passed since the Bank failed.

"Plaintiffs have no other remedy.

"Plaintiffs pray that the Court order this petition filed and citation to the defendants to appear and show if any reason they have why the writ applied for should not issue.

"Plaintiff further prays that this Court order the defendants each of them and as the Banking Board and Banking Commissioner to appropriate the money on hand in the Guaranty Fund when the Commercial Guaranty State Bank of Longview failed on September 29, 1927, and the amount collected to pay the guaranteed depositors to the exclusion of depositors of Banks that have failed since September 29, 1926.

"That defendants be ordered to file with their answers;

"1. The exact amount of money in the Guaranty Fund.

"2. The exact amount of claims against the Longview Bank that have been approved against the Guaranty Fund.

"This suit is brought for the benefit of all depositors of the Commercial Guaranty State Bank of Longview whose claims have been approved against the Guaranty Fund and who will share in the expense of the proceeding."

"The State Banking Board, composed of Claude Pollard, Attorney General of the State of Texas, James Shaw, Banking Commissioner of the State of Texas, and W. Gregory Hatcher, Treasurer of the State of Texas, and James Shaw, Banking Commissioner of Texas, who, in his official capacity, is in charge of the Commercial State Bank, Cisco, Texas; Altoga State Bank, Altoga, Texas; Farmers & Merchants State Bank, Mt. Calm, Texas; Guaranty State Bank of Trinidad, Trinidad, Texas; Farmers State Bank, Kemp, Texas; Guaranty State Bank, Gunter, Texas; Addison State Bank, Addison, Texas; and First State Bank of Belton, Belton, Texas, liquidating the same, they having been closed and placed in his hands for that purpose, for return and answer herein, represent:

"Respondents deny that, as a matter of law, under the facts of this case as they appear by the pleadings, relators have a vested right in, or a first lien on, or right to priority of payment of, the whole amount on hand in the Guaranty Fund on September 29, 1926, or any amount afterwards added thereto by assessment; and they further deny, as a matter of law, that the sole purpose of such assessment under the law was for the payment of protected depositors of the Commercial Guaranty State Bank of Longview; and respondents further deny that Article 467 of the Revised Statutes of 1925 has any application whatsoever to the situation presented in this case.

"Respondents further represent:

"That on the 29th day of September, 1926, the Commercial Guaranty State Bank of Longview was closed and placed in the hands of the Banking Commissioner of Texas for liquidation; at the time it was closed for liquidation it was insolvent and indebted to depositors whose deposits were protected by the Depositors' Guaranty Fund in the sum of $421,951.88; that after the closing of the Commercial Guaranty State Bank of Longview, the following named banks were closed and placed in the hands of the Banking Commissioner of Texas for liquidation, the date of their closing, the name of the bank, and the amount each owed to depositors whose deposits were protected by the Guaranty Fund being as follows:

| Date | Name | Amount |
|------|------|--------|
| October 31, 1926, | Commercial State Bank, Cisco, | $137,329.19 |
| November 3, 1926, | Altoga State Bank, Altoga, | 31,908.04 |

| | | |
|---|---|---:|
| November 16, 1926, | Farmers & Merchants State Bank, of Mt. Calm, Texas, | 62,974.73 |
| November 26, 1926, | Guaranty State Bank, Trinidad, | 71,665.31 |
| December 2, 1926, | Farmers State Bank, Kemp, Texas, | 43,910.31 |
| December 14; 1926, | Guaranty State Bank, Gunter, Texas, | 101,326.49 |
| January 3, 1927, | Addison State Bank, Addison, Texas, | 35,530.01 |
| January 7, 1927, | First State Bank of Belton, Texas, | 109,179.78 |

making a total indebtedness of the aforesaid banks to their depositors whose deposits were secured by the Depositors' Guaranty Fund of $1,013,714.73.

"Respondents represent that on September 29, 1926, being the day and date of the failure of the Commercial Guaranty State Bank, Longview, Texas, there was in the Depositors' Guaranty Fund and available to pay the depositors of said bank $346,460.09; that subsequent to September 21, 1926, and prior to the repeal of the Depositors' Guaranty Fund Law by the Legislature of the State of Texas, the State Banking Board assessed all banks operating under the Depositors' Guaranty Fund Law to the full limit allowed by law, realizing from such assessments $146,726.85, thus increasing the Guaranty Fund available to pay depositors of the aforesaid failed banks to the sum of $493,186.94.

"Respondents represent that since the Banking Commissioner took possession of the Commercial Guaranty State Bank of Longview on September 29, 1926, there has been paid to each of the protected depositors of said bank, out of the cash on hand and available constituting the liquidating fund of said bank, thirty (30%) per cent of their respective claims.

"Respondents represent that the Depositors' Guaranty Fund Law of the State of Texas was repealed by the Legislature of said State on the 11th day of February, 1927; that at the time said law was repealed, all banks operating under the Guaranty Fund System had been assessed to the full limit allowed by law and were not subject to further assessment, and that since the Depositors' Guaranty Fund Law has been repealed, there is no way of restoring the Guaranty Fund or increasing the same, and that said fund is insolvent and unable to pay the depositors of the aforesaid failed banks in full, and that therefore, under the law, as Respondents construe the same,

the Guaranty Fund on hand and available to pay the depositors of the aforesaid failed banks should be pro-rated to and among all the depositors of all of said banks, and that such is the intention of respondents unless otherwise ordered by this Honorable Court," and another plea not necessary to be noticed.

The right of relators to the writ sought depends upon their right to immediate and full payment from the available funds now in the hands of the Banking Board irrespective of the rights of the depositors of the other failed banks, this claimed right of preference of payment being predicated upon the statute.

Before entering into the specific inquiry, it is well to notice a few elementary principles applicable to the determination of the right to a mandamus generally. The writ of mandamus is a legal writ applicable alike in legal or equitable proceedings. But its issuance is most frequently determined upon equitable principles. Decatur v. Paulding (U. S.), 14 Pet., 497, 599, 10 L. Ed., 559; Kuechler v. Wright, 40 Texas, 600; Bradley v. McCrabb, Dallam, 504, 38 C. J., p. 544, Sec. 7. But whatever the technical nature of the writ, under all the authorities such extraordinary writ will not issue to compel a public officer to perform an act, unless a clear right to such performance in favor of the relator is shown, and likewise a correspondingly clear legal duty of such officer to perform is shown. In other words, mandamus to compel the performance of an official act will not issue where the act sought to be commanded involves an official discretion, but only where such act is ministerial in its nature. Kimberly v. Morris, 87 Texas, 637, 31 S. W., 808; Caven v. Coleman (Tex. Civ. App.), 96 S. W., 774, reversed on other grounds, 100 Texas, 467, 101 S. W., 199, 38 C. J., p. 690, Sec. 259.

The consideration involving, as it does, the disposition of a trust fund where insolvency has supervened, it should be determined upon principles of equity analogous to trusts and administrations generally. This is indisputable, because of the actual insolvency of the statutory fund and the repealing of the law whereby its restoration to solvency is doubtful, if not impossible. But, whether the consideration is to be controlled by equitable principles or not, nevertheless if the relators are entitled to preference in payment over other insolvent banks by virtue of the statute, then the writ should issue at all events, for equity will follow the law. So that, we are put to the necessity of examining the Act creating the fund sought to be appropriated, with a view of determining relators' contention of

vested right in, or priority of payment from, the fund now available in the hands of the Board.

The Bank Deposit Guaranty Law is found in Chapter 7, Title 16, of our present statutes (Vernon's Ann. Tex. Stat., Arts. 437–489). The initial sentence of Article 437 of the Act is:

"Every banking institution except savings banks, incorporated under the banking laws of this state shall protect its depositors either by availing itself of the Depositors' Guaranty Fund, or by the Depositors' Bond Security system."

Article 439 is the constating section which creates the respondent Board, consisting of the Attorney General, Banking Commissioner and State Treasurer, and confers upon the Board control and supervision of all State banking corporations and bank and trust companies with "power of regulation, control and management of the Depositors' Guaranty Fund and of the Depositors' Bond Security system, with power to adopt all necessary rules and regulations in harmony with law for the management of such system."

Article 443, creating the Depositors' Guaranty Fund, in so far as pertinent to the present consideration of the general purpose of the law, is as follows:

"For the purpose of creating a Depositors' Guaranty Fund, any bank or bank and trust company which shall elect to secure its depositors under the Guaranty Fund Plan, if its application is approved by the State Banking Board, shall pay to said Board on January 1st an initial payment of a sum equal to one per cent of its average daily deposits for the year next preceding November 1st prior to the date of payment, and annually thereafter, one-fourth of one per cent of its average daily deposits for the preceding year ending on November 1st. * * * When the amount available in said guaranty fund shall reach five million dollars, the Commissioner shall notify all banks and bank and trust companies subject to the provisions of this chapter of that fact at least thirty days before the next annual payment; and thereafter the banks and bank and trust companies participating shall not pay any further amount into said guaranty fund until it shall be reduced to a sum below five million dollars or below the amount of the guaranty fund on January 1st preceding. In the event of necessity to meet an emergency at any time, and not otherwise, the Banking Board shall have authority to require the payment for the current year of not exceeding two per cent of such daily average deposits, or such part thereof as may be necessary to restore said fund to the maximum above named, or to its amount as of January 1st preceding, or to meet the emergency. * * * *"

Article 444 provides for the manner and time of payment of said fund to the State Banking Board, and directs that the same shall be deposited with the State Treasurer as bailee, and paid out by the Treasurer on warrants drawn by order of the Board, and further that "said fund shall never be diverted from the purpose specified in this chapter, nor shall it ever be considered State funds."

Article 445 authorizes the refunding to contributing banks and trust companies a pro rata part of such fund under given circumstances.

Article 446 declares:

"All unsecured non-interest bearing deposits, including cashier's checks, bank drafts or exchange issued against or arising from bona fide unsecured and non-interest bearing deposits, shall be protected under the Guaranty Fund."

Article 447 makes clear the class of deposits which are not protected by the fund, emphasizing the purpose to be the protection only of that class of deposits described in Article 446.

Article 448 provides:

"If the Commissioner takes possession of any bank or bank and trust company subject to the Depositors' Guaranty Fund Plan, the depositors of such banking corporation shall be paid in full out of the cash on hand that can be made immediately available, if sufficient, and if not sufficient, the remainder shall be paid out of the Depositors' Guaranty Fund through the Banking Board."

The succeeding articles of the chapter are not thought to be important, since they deal, for the most part, with the details of liquidation of the failed bank or banks, and throw little light upon the general intention of the Legislature as affecting the interpretation of the articles immediately involved.

From first to last, there pervades the entire chapter the obvious, if not the sole, purpose of protecting "all unsecured non-interest bearing deposits" in the banks coming under the operation of the statute. Such is the emphatic language of Article 446. They "shall be protected under the guaranty fund." This overriding purpose is accentuated by the provision in Article 448 that after a distribution of the available funds on hand in the failed bank to such depositors, "the remainder shall be paid out of the Depositors' Guaranty Fund through the Banking Board." The Act will be read in vain to discover any other purpose of the law than the protection of all unsecured non-interest bearing deposits in failing banks coming within the statute. Indeed, we do not understand that this is disputed by either party. The relators base their contention of preference

specifically upon Article 448, already quoted, the contention being that its language is such as to give them a vested right to the extent of their deposits in the available funds in the hands of the Banking Board when the bank carrying their deposits was taken into the possession of the Commissioner of Banking, and that whether such payment was actually made or not, the purpose of the law being that they should receive such payment, its effect is to create an assignment or lien, both legal and equitable, as to such available funds, and that they can not be deprived of such vested right by the failure of the Board to make actual payment, as was its duty to do. It is true that equity will consider as done whatever the law required to be done under the circumstances, hence we will examine the statutes a little closer to ascertain the intention of the lawmakers on this specific point.

It is elementary that the intention of the makers of an instrument, whether statute, contract, or testament, will control its interpretation. If the act had spoken specifically with respect to the contingency of insolvency and the distribution of a sum short of full protection to all depositors, of course there would be an end of the controversy. No construction of the statute would be permitted, as none would be needed. But it is apparent there is no such specific provision for the situation that has arisen through failure of the scheme and repeal of the statute. The Legislature contemplated a plan providing for full protection of all depositors secured by a fund replenished from time to time through a system of assessments of member banks. They never for once, apparently, contemplated the exigency of an insufficiency of funds and provided for such an emergency. On the other hand, they expressly provided for such an emergency by a levy or assessment to secure the needed funds, thus to accentuate the major purpose of full protection to all depositors. But, not having made specific provision for the contingency that has arisen, the law will imply into the statute the intention that under such circumstances the remnant fund of the insolvent estate will be dispensed according to the principles of equity. Such an implication is justified, and even made necessary, because all men are presumed to intend equity and fair dealing, unless the contrary clearly appears, and especially will such implication be made when it is in keeping with the general expressed purpose of the instrument under consideration. Indisputably, payment in full to relators, thus exhausting practically the entire fund in the hands of the Board, is a material advantage to them over the other depositors of failed banks

and is tremendously unfair upon principles of equity, and will in no event be enforced or even permitted unless the intention of such preference is clear. The only language of the Act relied upon as making this intention clear has already been quoted from Article 448. But, we are of the opinion the language does not justify the contention, which is obviously at variance with the general purpose of the law. To our minds, the language does no more than indicate a priority of right as to maturity of claims for payment. The language is: "The remainder shall be paid out of the Depositors' Guaranty Fund through the Banking Board." There is not one word indicating an appropriation of any special fund or part of fund. The language is merely the establishment of a liability and does not make the same payable out of any particular portion of the fund. It is no more in legal effect than the final establishment of the liability of the Depositors' Guaranty Fund. It, of course, is to be implied that such liability is presently payable, but there is lacking that essential intention creating a preference by way of assignment or lien, either legal or equitable.

Now, for the moment reverting to the principle that equity will consider that as done which should have been done by the Commissioner, it is seen that there is no clear indication that the depositors of the bank first failing should be paid necessarily out of the funds then on hand, for such is not necessarily true. Under the provisions of the law, such payment may be made from assessments by reason of the absence of available funds actually on hand at the time of such failure. But, upon the broad principles of equity, it is not clear that the Commissioner of Banking should have paid relators' claims upon their being approved, for if the interpretation we have indicated is the correct one, then it was not his duty to pay them in full, for as a careful, competent official, he is presumed to have done his duty and to have been familiar with the situation which threatened imminent insolvency. If, in such a situation, he had exhausted all possible funds to the obvious loss of others who, by the express terms of the act, were entitled to equal protection, his conduct would have been little less than reprehensible. Certainly, the Commissioner's course in the instant case was within his plain duty as the administrator of an important public and private trust. The provision that the remainder due to depositors shall be paid out of the Depositors' Guaranty Fund through the Banking Board, of course means in the regular and orderly method of administering the law. This contemplated solvency, an ample reserve fund, and a liberal

power of assessment of member banks. But, when the machinery by which these affairs are administered has broken down, the plan made impossible of further execution, the available fund wholly insolvent, and the law creating the scheme itself repealed, that orderly process of payment is no longer practicable or even possible, according to the original, contemplated means and methods of performance, but rather is controlled by the principles of equity applicable to trust funds and administrations generally. There can be no doubt as long as the statute was in force, and the means of replenishing the guaranty fund were available, that depositors were entitled to payment in the order in which their claims matured,—in other words, as their debtor banks were taken over by the Commissioner. While the statute does not specifically declare that such payment shall be made out of the funds then available, of course it could mean nothing else. Such is the necessary implication. There is no other way payment could be made. But this would not mean to create a preference, the effect of which would create a lien any more than an ordinary debtor's promise to pay at maturity would have such effect. An ordinary debtor promises as a matter of law to pay his creditors in the order in which their respective debts mature, and necessarily out of any available funds then on hand, but it has never been thought that this in any wise creates an equitable assignment or lien upon such existing funds in favor of the debt first maturing. Upon insolvency, the estate is administered upon equitable principles, without preference as to priority of maturities. Preferences come only by contract or statute.

We think the construction of the statute contended for by relator is due largely, if not wholly, to a failure to distinguish between priority of payment and preference in payment. The act does provide for priority of payment of the depositors of banks in the order of their liquidation, but by no process of reasoning or logic can such provision be construed to mean that the depositors in any failed bank shall be entitled to a preference in payment as against the claims of depositors in other insolvent banks. The Legislature, in enacting this law, was necessarily compelled to fix some definite time for the maturity of the claims of depositors in insolvent banks as a means of instructing the banking commissioner as to when such claims should be ripe for payment. The provision in question was intended for this purpose and nothing more. That it was not designed to give a preference in payment is clearly implied from the provision for immediate replenishment of the fund so as to raise sufficient funds to pay in full the depositors in banks subsequently failing. In other

words, the provision for the payment for depositors in banks in the order of their liquidation was clearly upon the theory that by the replenishment process sufficient funds would be promptly forthcoming to give depositors in banks thereafter failing the equal protection which the act had declared all were entitled to.

It must not be overlooked that all of the banks now in liquidation were required by this act, and have in fact, borne their proportionate part of assessments levied to make up the guaranty fund out of which the depositors of other insolvent banks have received protection. The payments of these assessments were made under the evident belief that the general purpose of the act was to protect all depositors of member banks without discrimination. If it should now be determined that this system is not in truth and in fact a mutual one, giving equality of protection, banks denied the protection for which they believed they were paying will doubtless feel toward those administering this fund as did Macbeth toward the weird sisters when he said :

"And be these juggling fiends no more believed,
        That palter with us in a double sense,
        That keep the word of promise to our ear
        And break it to our hope."

In construing any statute, as indeed any instrument, the intention of the framers is the prime inquiry. While the occasion for the inquiry is usually what a particular provision, clause or word means, yet to answer the inquiry "one must proceed as he would with any other composition—construe it with reference to the leading idea or purpose of the whole instrument. A statute is passed as a whole and not in parts or sections and is animated by one general purpose and intent. Consequently each part or section should be construed in connection with every other part or section and so as to produce a harmonious whole. It is not proper to confine the attention to the one section to be construed. It is always an unsafe way of construing a statute or contract to divide it by a process of etymological dissection, into separate words, and then apply to each, thus separated from its contex, some particular definition given by lexicographers, and then reconstruct the instrument upon the basis of these definitions. An instrument must always be construed as a whole, and the particular meaning to be attached to any word or phrase is usually to be ascertained from the context, the nature of the subject treated of and the purpose or intention of the parties who executed the contract, or of the body which enacted or framed the statute or constitution." Lewis' Suth. Stat. Con., Vol. 2, Section

368. "The presumption is that the lawmaker has a definite purpose in every enactment, and has adapted and formulated the subsidiary provisions in harmony with that purpose; that these are needful to accomplish it; and that if they have the intended effect, they will, at least, conduce to effectuate it. That purpose is an implied limitation on the sense of general terms, and a touchstone for the expansion of narrower terms. This intention affords a key to the sense and scope of minor provisions. From this assumption proceeds the general rule that the cardinal purpose or intent of the whole act shall control, and that all the parts be interpreted as subsidiary and harmonious. The purpose for which a law was enacted is a matter of prime importance in arriving at a correct interpretation of its parts." Ibid., Sec. 369.

So that, when thus interpreted, bearing in mind the predominating purpose to treat all depositors alike, the provision in Article 448 that "the remainder shall be paid out of the Depositors' Guaranty Fund through the Banking Board," even when there is implied the additional requirement that the same is to be paid out of funds then on hand, cannot be given that interpretation which would thwart the general purpose of the Act by creating an inequality amongst depositors equally entitled to the benefaction of the statute. Such interpretation would be to create preferences and not to foster equality of right.

This interpretation as to intention has found frequent and pointed illustration in testamentary instruments. In Lake v. Copeland, 82 Texas, 464, 17 S. W., 786, a will, after declaring a desire for an equal division of the testator's estate between his wife and daughter, then devised specific property to the wife and likewise to the daughter certain property including the house and lot known as the "Jones place." After the death of the testator, it appears the title to the Jones place had failed and that action was instituted by the daughter to recoup her loss to the extent of one-half. The Supreme Court sustained her claim upon the theory that the *intention* of the testator being to treat his wife and daughter upon terms of equality, such intention could not be thwarted upon the failure of the title to the specific property devised to the daughter, holding in the language pertaining to wills, that such devise, though specific in form, was yet in truth demonstrative or a suggested means or method of effectuating his general purpose of equal distribution. The reason is sound and convincing. The same principle was applied in Kenneday v. Sinnott, 179 U. S., 606, 45 L. Ed., 339.

The present case may be likened unto a father who is possessed of ample properties, who makes his will, directing that his executor will pay to each of his nine sons the sum of $10,000.00, the same to be paid to each son as he arrives at the age of twenty-one years, such payment to be made out of the available funds on hand, with the necessary provision for collections on securities to meet emergencies. After the father's death, the estate fails and there is only enough to pay the son first becoming of age, with little or nothing left to protect the bequests to the others. Would any court hold that the father intended that the literal provision for payment of the first child should be complied with when its effect would be to defeat the equal rights of all the others contrary to his expressed desire for equality? Such a conclusion would be at absolute variance with the clear purpose and intent of the testator.

So that, whether the statute is interpreted upon the theory of intention or upon the theory of distribution of trust estates, the same result follows. To award the writ prayed for we think would be to do violence to the spirit of the statute and would be to ignore every principle of equity.

We think the guaranty fund system of this state may well be likened to a mutual form of insurance in which member banks are ratably assessed, and in which each has an equal right to share in the fund created for the protection of all depositors of the class named in the statute. For this reason, we think the principles laid down in dealing with insolvent mutual insurance and mutual building and loan associations as to priority in payment of matured and unmatured certificates are applicable to this case.

In the case of Williams v. United Reserve Fund Associates, 166 Mass., 450, 44 N. E., 342, it was contended that an endowment fund was a trust fund for the payment of matured certificates, but the court held that it was equally a trust fund for the benefit of all certificate holders.

In the Appeal of Criswell, et al., 100 Pa. St., 488, it was held that, "upon the insolvency of the building association, and an assignment for the benefit of creditors, the holders of matured stock are not creditors and can only share pro rata with the holders of unmatured stock after the payment of creditors of the corporation." To the same effect see Heinbokel v. Association, 58 Minn., 340, 59 N. W., 1050, 49 Am. St., 519, 25 L. R. A., 215; Towle v. Association, 75 Fed., 938; Gibson v. Ass'n, 69 Ill. App., 485.

In Williams v. United Reserve Fund Associates, 166 Mass., 450, 44 N. E., 342, also an action to wind up a similar association, insolvent in the sense that it could not mature and pay its outstanding certificates, it was there held:

"The rule of distribution in winding up a company of this sort is necessarily different from the order of payment made by it while a going concern."

In Youth's Temple of Honor v. Laddy, 73 Minn., 319, 76 N. W., 59, it appeared that an endowment association made an assignment. The holders of matured certificates claimed that they should be paid in full out of the endowment fund in preference to the claim of any other certificate holders, on the ground that at the time of the assignment their certificates had matured and were existing debts against the corporation, and that the endowment fund was a trust fund set apart expressly and exclusively for the payment of their claims as they matured. The holders of unmatured certificates claimed that they were entitled to be paid pro rata with the matured certificate holders. The court, in granting the plea of the unmatured certificate holders, said:

"Every member in such an association has an interest in the endowment fund, and has contributed to it. To paraphrase from the opinion in People v. Security Life Insurance and Annuity Association, 78 N. Y., 128, one who has paid his money to carry an endowment certificate to maturity has no better right and no greater equity to an endowment fund than has another who has paid his money to carry a like certificate to maturity."

We think the case of American Loan & Trust Co. v. Northwestern Guaranty Loan Company, 166 Mass., 337, 44 N. E., 340, is decisive of the identical question here involved. The reasoning of the court is clear, convincing, and unanswerable, and is so opposite to this case that we quote at length therefrom:

"The master finds that the claims entitled to participate in the fund are to be paid pro rata, and that no claimant is entitled to priority or payment in full before any other claimant, because of any written demand upon the trustee. It is contended that this finding is wrong, and that the claims entitled to share in the fund are to be paid in the order in which demands were made upon the plaintiff, under the provisions of the fourth paragraph of the trust agreement. We are of opinion that the master is right. The trust agreement nowhere speaks of the priority of one claim over another. It does not state in terms that, if the fund proves too small to satisfy all claims, those first demanded shall be paid in full. No doubt, it

would be the duty of the trustee, if a demand made under the fourth paragraph had been made, to proceed to sell securities, and, within 60 days after the receipt of the proceeds, to satisfy and pay the defaulted guaranty, without regard to possible future claims upon guaranties not in default. In every such case the Northwestern Company, under the fifth paragraph of the agreement, must deposit fresh securities to make good the depletion of the fund; and, until default upon a guaranty, it was the duty of the trustee to pay over to the Northwestern Company the income of the trust fund. These provisions regulate justly the administration of the fund in the ordinary course of affairs. But we cannot read into the paragraph a provision that, if the fund is insufficient to pay all claims known to exist against it, claims demanded shall be paid in full in the order of demand. This would defeat the plain general purpose of the agreement, which is to create a trust for the benefit of the holders of any and all guaranties to which it applied which might be outstanding. The provisions for written demand and for payment within 60 days after the trustee is in receipt of the proceeds of sales are not to be construed as giving a preference to one or more claims over other claims existing at the same time, and known to the trustee. All holders of defaulted guaranties who make the requisite demand are entitled to share in the fund; and, if the fund is too small to satisfy all, they must share pro rata. The agreement was intended as security both in the ordinary course of business and in times of stress and failure; and we cannot read into a provision intended to regulate the ordinary administration of the fund a provision not found there in terms, which would make, of a trust intended for the equal protection of all the outstanding guaranties of a certain class, a lottery in which the holders of the guaranties first defaulted could exhaust the whole fund, to the exclusion of the other beneficiaries. The claims against the fund are not payable upon demand, but within 60 days after demand and receipt by the trustee of the proceeds of sales of deposited securities. The demands may be upon different days, but the claims may become payable at the same time, determined by the receipt of the proceeds; and it is not stated whether the securities have yet been sold, and the proceeds received by the plaintiff. The master's construction of the instrument is in accord with the principles which we have followed in dealing in equity with claims to priority of satisfaction. We do not assent to the doctrine that priority in the maturity of a claim against a fund to be distributed in equity gives the right to preference or priority of satisfaction, and we have disregarded priority of maturity and

priority of assertion or demand, where a lien upon the the fund has not been otherwise established." Citing Merrill v. Ins. Co., 166 Mass., 238, 44 N. E., 144; Kittredge v. Osgood, 161 Mass., 384, 37 N. E., 369; Mason v. Pomeroy, 151 Mass., 164, 24 N. E., 202, 7 L. R. A., 771.

Mere priority of payment is clearly insufficient to create a lien on the guaranty fund. In absence of a lien, legal or equitable, in favor of the Longview bank, it is not entitled to preferential treatment in the distribution of this fund.

In the oral argument the assertion was made that the guaranty fund is not insolvent because the Banking Board has authority to levy against the twenty-eight banks in the system at the time of the repeal of the guaranty law the two per cent assessment each year until sufficient funds are produced to liquidate all insolvent banks. It may be proper, therefore, to determine what power of assessment was vested in the Banking Board by the saving clause of the repealing act.

Chapter 12 of the regular session of the Fortieth Legislature expressly repealed Article 443, which authorized the banking board "to require the payment for the current year of not exceeding two per cent of such daily average deposits as may be necessary." The saving clause of the repealing act, in so far as it preserves the right of assessment given by Article 443, provides:

"And further provided that the passage of this act shall not affect the liability of state banks for assessments to the guaranty fund *as such liability existed at the time this act takes effect.*"

An ascertainment of what is meant by the provision, "as such liability existed at the time this act takes effect," will determine the power of assessment now possessed by the Banking Board.

To construe this provision to mean that the Banking Board could continue to annually levy the two per cent assessment against banks in the system through a long period of years until all insolvent banks are fully liquidated would work a manifest hardship on such banks. They became members of a system founded upon the mutual principle. Under such an interpretation such principle would be wholly ignored and they would be heavily penalized for a number of years, during which time their own depositors would receive no protection whatever from the guaranty fund.

A statute should never be so construed as to work injustice and hardship, if the language used can reasonably be given any other construction. If the statute admits of two constructions, it is ob-

vious that the more reasonable of the two should be adopted as that which the Legislature intended. We should not attribute to the Legislature an intention to do what is a clear, manifest and gross injustice. Rather the presumption should be, where the design of the Act is not clear, that the Legislature intended the most reasonable and just interpretation to be placed upon it.

Tested by these rules we think the provision in question contemplated that banks which were members of the system on February 11, 1927, at the time the repealing act took effect, would be liable for the two per cent assessment for the current year; that it was only intended to give the Banking Board power to assess such banks for the liability which had accrued at that time and did not contemplate a contingent liability of future annual assessments so as to authorize assessments over an unlimited number of years.

It appears that the Banking Board, acting by virtue of the power conferred by the repealing act has levied the maximum assessment against all banks for the year 1927, and we are of the opinion that no further assessments can legally be made against them.

The writ of mandamus should be refused, and the Banking Commissioner should be allowed to proceed in accordance with the plan of pro rata payments, applying thereto all available funds in hand.

The opinion of the Commission of Appeals is adopted, and the mandamus refused.

*Thos. B. Greenwood,* Associate Justice.
*William Pierson,* Associate Justice.