**CANADIAN RIVER MUNICIPAL WATER AUTHORITY et al., Appellants,**

v.

**CITY OF AMARILLO et al., Appellees.**

**No. 8467.**

Court of Civil Appeals of Texas, Amarillo.

Nov. 18, 1974.

Rehearing Denied Dec. 31, 1974.

McGinnis, Lochridge & Kilgore, Robert C. McGinnis, C. Morris Davis, Austin, Gerald Huffaker, Tahoka, John Saleh, Lamesa, Fred O. Senter, Jr., Lubbock, Vernon D. Adcock, Lamesa, Frank B. Kiser, Jr., Levelland, W. J. McGowan, Brownfield, Harvey L. Morton, Slaton, Joe Sharp, Plainview, for appellants.

Underwood, Wilson, Sutton, Berry, Stein & Johnson, Harlow Sprouse and Gerald G. Bybee, J. Bruce Aycock, City Atty., Amarillo, for appellees.

PER CURIAM.

The basic issue involved in this appeal relates to the method of determining the distribution of the annual operation and maintenance expenses among the eleven member cities of the Canadian River Municipal Water Authority, hereinafter called "Authority," an entity created by the Texas Legislature for the purpose of providing a municipal water supply for the various member cities. The Authority and the Cities of Plainview, Lubbock, Brownfield, Levelland, Tahoka, O'Donnell, Slaton and Lamesa, Texas, eight of the eleven member cities, defendants-appellants, have appealed from a declaratory summary judgment entered by the trial court in favor of the Cities of Amarillo, Borger and Pampa, Texas, plaintiffs-appellees, the other three member cities of the Authority. The summary judgment decreed that the operation and maintenance costs of the project should be charged against the respective member cities on the basis of a table of percentages referred to in a resolution adopted by the Authority's Board of Directors on August 8, 1960. The appellants challenge this judgment on the grounds that the table of percentages referred to in the resolution is applicable only to the allocation of construction costs and that the operation and maintenance costs are fixed by contracts between the several member cities and the Authority whereunder each city is required to pay as its pro rata share of the total operation and maintenance costs of the project the cost of delivering water to such city. Reversed and rendered.

The suit was instituted by the Cities of Amarillo, Borger and Pampa against the Authority and the other eight cities seeking a declaratory judgment that the operation and maintenance costs were fixed on the basis of the table of percentages referred to in the August 8, 1960 resolution. Also, the plaintiff cities sought an accounting and an injunction. The Authority and the other eight cities pleaded in their answer, among other things, that such table of percentages referred only to the allocation of construction costs of the project and that it was not the intention of the parties that operation and maintenance costs be determined according to such table. Additionally, the defendant sought, by counterclaim, a declaratory judgment decreeing that the operation and maintenance costs were fixed by the contracts between the respective cities and the Authority providing that each city would pay as its share of the total operation and maintenance expenses the costs of delivering water to such city. Also, the defendants sought a money judgment against the plaintiff cities.

All parties on both sides moved for a summary judgment and the trial court severed and considered the declaratory judgment phase separately from the other aspects of the case. The court overruled the defendants' motion for summary judgment

and granted the plaintiffs' motion, declaring as a matter of law that the operation and maintenance costs were fixed on the basis of the table of percentages referred to in the resolution. The defendants have brought this appeal on two points of error, contending that the trial court erred in granting the plaintiffs' motion for summary judgment and in overruling the defendants' motion. These points will be considered together.

By way of overview, the Authority, comprising the territories of the above named eleven cities, was created pursuant to the provisions of Article 8280-154, Vernon's Ann.Civ.St., enacted in 1953, for the primary purpose of effectuating a project to provide a municipal water supply for such member cities located in the Panhandle and South Plains of Texas. The statute provides that the Authority's powers are to be exercised by a Board of Directors composed of representatives from the constituent cities. The Authority was authorized to enter into contracts to supply water to the cities and to contract with the United States Government to finance the construction of the physical facilities of the Authority. The whole system was to be built for the Authority with funds furnished by the United States Government with repayment by the Authority over a 50 year period out of the revenues to be collected by the Authority from sales of water services to the member cities and other water purchasers.

The statutory provisions pertaining to the functioning of the Board of Directors of the Authority and the relationship of the Board with the cities and the United States Government are, unless otherwise indicated, contained in the specified portions of Article 8280-154. The general provision in the statute governing Board action is Section 5(a) which provides:

"The Board of Directors shall perform official actions by resolution and a majority of their number shall constitute a quorum for the transaction of any and all business of the District. A majority vote of the quorum present shall be sufficient in all official actions including final passage and enactment of all resolutions, except as herein elsewhere otherwise specifically provided."

Section 13(o) authorizes the Board of Directors of the Authority:

"To fix and collect charges and rates for water services furnished by it and to impose penalties for failure to pay such charges and rates when due, provided that such charges, rates and penalties shall be fixed only by unanimous vote of the members of the Board of Directors constituting a quorum and who are present at a regular meeting."

Section 13(p) authorizes the Board of Directors:

"To cooperate and enter into contracts with cities . . . for the purpose of supplying and selling them surface, storm and flood water for municipal . . . and other useful purposes permitted by law . . . . Any such contract may be upon such terms and for such time as the parties may agree . . . . No contract for the sale of water or other services by the District to any member or other city shall be entered into until approved by a majority vote at an election held in such city for the purpose, pursuant to a call therefor by its governing body in accordance with the provisions of Article 1109(e), Revised Civil Statutes of Texas, 1925, as amended. . . . In the event the District shall have contracted with the United States Government or any of its agencies for a source of water supply or for the furnishing of any facilities necessary or useful to the District in carrying out its purposes, any such contract entered into under authority hereof may provide that it shall continue until the District has fully discharged all obligations incurred by it under the terms of its contract with the United States Government or its agencies. . . ."

Section 1 of Article 1109e, V.A.T.S., authorizes each of the cities to enter into a contract with the Authority for the purpose of supplying water to such city. Such contracts must be authorized by a majority vote in an election held in such city. Section 2 of Article 1109e provides:

"Any water supply contract provided in the preceding section shall be subject to the statutory or the contractual duty of the district from time to time to revise the rate of compensation for water sold and services rendered by the district to the city under such contract so that the net revenues of the district will at all times be sufficient to enable the District to pay its operation and maintenance expense . . . ."

Section 2 further provides that where bonds secured by such contract are involved, sufficient rates are required to pay the principal and interest obligations. Section 15(e) of Article 8280–154, provides:

"Where bonds or any other contract payable wholly or partially from revenues are issued or entered into, it shall be the duty of the Board of Directors to fix by contract with all cities, persons, firms, corporations or public agencies which may contract with it for a water supply or water facilities, such rates or compensation for water sold and services rendered by the District as will be sufficient to pay the expenses of operating and maintaining the District and its facilities and to pay, as they mature, all such obligations incurred by it, including such reserve and other funds as may be provided for the bonds or other contracts under the terms thereof, and as may be provided in the Board of Directors' resolution pertaining thereto."

Section 17(a) of Article 8280–154 authorizes the Authority to contract with:

". . . the United States Government and any of its agencies or under the Federal Reclamation Laws for the construction, operation and maintenance of any work or facility by which water may be supplied and distributed to the District under any Act of Congress providing or permitting such contract, and shall have all the rights, powers, privileges and authority granted Water Improvement Districts . . . under the General Laws of the State in that respect. . . . In the event such a contract is proposed to be made whereby the District [Authority] shall become obligated to make payments wholly or partially from ad valorem taxes, or otherwise, such contract shall not be entered into unless authorized by an election . . . and unless a majority of the votes cast at said election is in favor of the execution of the contract."

After several years of discussions and negotiations, on August 8, 1960, the Board of Directors of the Authority unanimously adopted the following resolution:

"BE IT RESOLVED by the Board of Directors of the Canadian River Municipal Water Authority at this its regular meeting held August 8, 1960, that the charges and rates for water services to be furnished by the Authority to its member cities are hereby approved as those which are reflected by the percentages shown in the tabulation dated July 11, 1960, prepared for the Canadian River Authority by the Bureau of Reclamation, and which said tabulation is attached hereto and made a part hereof for all purposes."

The record discloses that the written instrument attached to the Resolution was certified by the Secretary of the Board of Directors of the Authority on December 13, 1960, in the following language:

"State of Texas
County of Hutchinson

"I, A. A. Meredith, Secretary, Board of Directory (sic), Canadian River Municipal Water Authority, hereby certify that the following tabulation is a true and correct copy of the Pricing

Formula unanimously adopted by said Board Aug. 8th, 1960.

"Given under my hand and seal of office this 13th day of December, 1960."

The tabulation which was prepared by the Bureau of Reclamation and attached to the August 8, 1960 resolution, bears the heading "CANADIAN RIVER PROJECT, TEXAS." Underneath this heading · are three tables or tabulations setting out calculations of costs for various items and categories of information pertaining to the total project and with respect to each of the eleven member cities. The first of such tables or tabulations with appropriate columns referable to the total project and each member city, is designated:

"August 28, 1958 Use of Facilities Allocation ·
(Corrected for equal water use by Amarillo and Lubbock)."

The second table is labeled:

"July 11, 1960 Adjusted Allocation."
The third portion of the tabulation is designated as:

"Suggested Basis of Agreement."
The August 28, 1958 and the July 11, 1960 tabulations show all categories of costs in dollars, including separate items of (1) construction costs of the aqueduct, dam and reservoir and the interest thereon with allocations of sums for each member city, together with the total capital cost of the project; and (2) the 50 year Operation, Maintenance and Replacement Costs as assigned to each city, along with the total revenue requirement for the project and each of its member cities. Also, the August 28, 1958 and the July 11, 1960 tables each set out the total number of gallons for the 50 year water delivery, as well as the required water charge in cents per 1,000 gallons for untreated water, allocated to each member city with respect to (1) capital repayment and (2) Operation, Maintenance and Repair Costs. The third and final designa-

tion on the tabulation attached to the August 8, 1960 resolution, especially significant in the determination of the basic issues of this case, is more fully set out as follows:

"Suggested Basis of Agreement

"Percent of Actual Construction Costs to be Assumed by Project Cities

"Aqueduct (with columns of allocations for each member city)

"Dam and reservoir (with columns of allocations for the various member cities excepting Levelland, Brownfield, Slaton, Tahoka, O'Donnell and Lamesa)

"Operation, Maintenance and Replacement Costs—Each city to bear the proportional share of the costs of delivery of project water to project cities." ·

On the same date that the resolution was enacted, a proposed draft of the water supply contracts was reviewed by the Board. The section of the contract dealing with payment of operation and maintenance costs was revised, and, as finally rewritten was approved by the Board of Directors on September 12, 1960, for submission to the voters. The water supply contracts as submitted to and approved by the electorate of each member city for approval each contained the following provisions:

"OPERATION AND MAINTENANCE CHARGES

"4. a. At an appropriate meeting in each calendar year in no event, however, to be later than November 1, the Board of Directors of the Authority shall determine the total charges estimated to be required during the next year for operation and maintenance of the project including accumulating the necessary reserve funds. A detailed budget shall be made available to the City at least two weeks prior to the Board meeting for review and comment.

"b. The city shall pay its share of the total operation and maintenance charges required to deliver water to the City, on the basis of the advance estimates prepared by the Authority. At the end of each year an adjustment will be made in the operation and maintenance charges to reconcile the charges with actual costs, reserve fund requirements, and water uses.

"c. Payment of all operation and maintenance charges due from the City shall be made by the City to the Authority on such dates and in such amounts as are designated by the Authority to provide it with funds when needed, as determined by the Authority, provided that no installment shall be due and payable before the day upon which the project is sufficiently complete to permit diversion by the City of the supply of water allocated to it in this contract . . . . Whenever collections from all sources are insufficient to defray Authority operation and maintenance expenses and payments, proportionate additional payments may be required through supplemental notice . . . . Such notice shall set forth the justification for the increase in full detail.

## "CONSTRUCTION REPAYMENT OBLIGATION

"3. In consideration of the allocation to it of [percentage assigned] percent of the normal water supply from the project, or a like percentage of any lesser available supply, the City shall pay to the Authority [agreed percentage] percent of the actual reimbursable cost of constructing the dam and reservoir, and [agreed percentage] percent of the actual cost of constructing the aqueduct, all as determined by the United States . . . each annual installment due the United States shall become due and payable on or before October 1 of each year commencing with the year immediately following that in which a notice is given

by the United States stating that the project is sufficiently complete to permit the initiation of water deliveries and water is available to serve member cities . . . ."

The making of the water supply contracts was a predicate for the contract between the Authority and the United States Government. Not only does the contract between the Authority and the United States make provision for the Authority's repayment of the required construction costs but also for the required costs of operation and maintenance of the project. Section 5a of this contract provides specifically that the Authority is to pay its operation and maintenance costs and is obligated to "operate and maintain the project works upon sufficient completion of the project to permit the delivery of water, . . . and in such a manner that the project works shall remain in good and efficient operation condition." Section 5b requires the Authority to make and pay for all repairs to the project works necessary for proper service and operation. Section 19 of the contract between the United States Department of the Interior, Bureau of Reclamation and the Authority, provides:

"The United States shall be under no obligation to commence, or having commenced, to continue construction of the project works until the Authority shall have negotiated and confirmed contracts acceptable to the Contracting Officer with the member cities or others, requiring said contractors to purchase a portion of the project water supply at rates adequate to repay that portion of the construction charge obligation allocated for repayment by the Authority. Such contracts shall provide for assignment to the United States upon the request of the Contracting Officer and shall provide for approval in advance of the effective date by the Contracting Officer. They shall not be amended or terminated without his written consent. The obliga-

tion of each member city shall constitute an operating expense of its water system."

In this connection, when the Authority enters into a contract such as its contract with the United States, Section 15(e) of Article 8280–154 requires the Board of Directors to fix by contract such rates for water services as will be sufficient to pay the expense of operating and maintaining the Authority and to pay its contractual obligations as they become due.

On November 28, 1960, the Authority entered into the contract with the United States. On January 9, 1961, the Board of Directors of the Authority adopted a resolution expressly approving the water supply contracts for all member cities except Lamesa. On September 11, 1961, the Board of Directors expressly approved the water supply contract for the City of Lamesa.

For several years following the August 8, 1960 resolution and the resolutions approving the Authority—City contracts, there was no water delivered nor charges and rates collected by the Authority because the dam, reservoir and aqueduct systems were under construction. When operations finally began, the construction portion of the charges and rates collected was based upon the construction percentages set out in the attachment to the August 8, 1960 resolution (except as amended by the contracts with Tahoka and O'Donnell).

This controversy arose over the allocation of the operating and maintenance costs among the cities on a year by year basis. The period covered by the trial court's judgment includes the budget years of 1971–72 and subsequent years. As a result of the suit filed, each side sought declaratory judgment as to the proper method for determining the rates for operation and maintenance expenses, whether by the tables of percentages set out in the tabulation or by the Authority—City contracts. Both sides were in agreement that the per-centage tables were applicable to the repayment of construction costs. While questions of application of whatever method is determined as the proper method for allocating the operation and maintenance costs among the member cities are present in the controversy giving rise to this case, this appeal does not involve such question because the trial court severed out of the controversy all questions of application, leaving only the questions as to the proper method for allocating the operation and maintenance costs among the constitutent cities.

In considering the vital questions presented in this appeal, it is appropriate to consider the resolution and the contracts in the light of the pertinent statutes and recognized rules of construction. The appellees contend that as a matter of law the resolution fixed all charges to the member cities (operation and maintenance as well as construction) according to a table of percentages shown in the tabulation attached to the resolution. The appellants contend that the water supply contracts entered into between the Authority and the member cities govern the allocation of expenses of operations and maintenance as well as construction costs and, that under the reasonable interpretation of the contracts, each city is obligated to pay as its share of the total cost of operation and maintenance charges the cost of delivering water to that city.

We have carefully considered the language of the August 8, 1960 resolution and have determined that the resolution makes the whole tabulation a part thereof for all purposes. Initially, it is significant to note that the certificate of the Secretary of the Authority, dated December 13, 1960, attached to the resolution recites: "I . . . hereby certify that the following tabulation (referring to the entire instrument) is a true and correct copy of the Pricing Formula unanimously adopted by said Board Aug. 8th, 1960." The resolution expressly incorporated all of the July 11, 1960 tabulation for all purposes. From

an examination of the portion of the Bureau of Reclamation tabulation annexed to the Authority's Resolution of August 8, 1960, designated as "July 11, 1960 Adjusted Allocation," it is obvious that the allocation of the total estimated construction costs relating to dam and reservoir and aqueduct among the various cities is in the identical proportion which has been reflected as "percentages" of construction costs shown in the lower portion of such tabulation designated as "Suggested Basis of Agreement." For example, the July 11, 1960 Adjusted Allocation relating to aqueduct shows a total estimated cost of $63,323,000, and the portion thereof allocated to Pampa is $3,886,000, or 6.13% thereof. The amount relating to Dam and reservoir shows a total estimated cost of $29,286,000, and the portion thereof allocated to Pampa is $2,103,000, or, 7.181% thereof. The 6.-137% for aqueduct and the 7.181% for Dam and reservoir respectively (total 13.-318%) are the precise respective percentages assigned to Pampa in the "Percent of Actual Construction Costs to be Assumed by Project Cities" table set out in the "Suggested Basis of Agreement" portion of the exhibit attached to and made a part of the resolution. However, no such correlation exists as between the "50-year OM & R (Operation, Maintenance & Repair) cost" assigned to the respective cities in the "July 11, 1960 Adjusted Allocation" and the "Percent of Actual Construction Costs to be Assumed by Project Cities" table. For example, the 50-year OM & R total estimated cost is $60,800,000, and Pampa is allocated $2,812,000, or 4.598% thereof as compared to the above described 6.137% and 7.181% respective assignments of aqueduct and Dam and reservoir construction costs. Likewise, there is no correlation between the cents per gallon estimated for OM & R cost allocated to the various cities and the percentages assigned as "Percent of Actual Construction Costs to be Assumed by Project Cities." Thus, it is apparent that the assigned percentages in the "Percent of Actual Construction Costs to be Assumed by Project Cities" is

applicable only to "Construction Costs" and not to operation and maintenance costs. The percentage table is labeled "Percent of Acutal Construction Costs to be Assumed by Project Cities," and there is no showing in the tables to indicate that they apply to the allocation of operation and maintenance costs. Immediately under the "Percent of Actual Construction Costs to be Assumed by Project Cities" and also as an integral part of the "Suggested Basis of Agreement" there appears the following: "Operation, Maintenance and Replacement Costs—each city to bear the proportional share of the costs of delivery of project water to the project cities." There is no language in the portion dealing with operation and maintenance costs which tends to relate them to construction costs.

■ A general word like "percentage" should normally be construed in its general sense. Gulf Ins. Co. v. James, 143 Tex. 424, 430, 185 S.W.2d 966, 969 (1945). Webster's Third New International Dictionary (G. & C. Merriam & Co., 1961), p. 1675, sets out: "A percentage is an 'indeterminate' part or number: proportion." Random House Dictionary of the English Language (1966), p. 1069, defines percentage as "a proportion in general." We believe it is proper to look to the entire July 11, 1960 tabulation as having been enacted as an integral part of the August 8, 1960 resolution and not just the two lines of percentages found in connection with construction cost allocations, set out in the "Suggested Basis of Agreement."

Appellees argue that only the lines setting out the "Percent of Actual Construction Costs to be Assumed by Project Cities" were incorporated and that such percentages are applicable to operational and maintenance costs. As above set out, the percentages are actually a "carry forward" of the July 11, 1960 Adjusted Allocation of Construction Costs to the "Suggested Basis of Agreement." As above demonstrated, there is no similar "carry forward" on Operational and Maintenance costs from the July 11, 1960 Adjusted Allocation table.

Rather with respect to operational and maintenance costs, the Suggested Basis of Agreement contained a general flexible provision for "each city to bear the proportional share of the costs of delivery of project water to the project cities."

We observe that the first table set out in the Bureau of Reclamation tabulation, and we consider the entire tabulation incorporated as a part of the August 8, 1960 resolution, deals with an August 28, 1958 "Use of Facilities Allocation," adjusted for equal water use by Amarillo and Lubbock. The July 11, 1960 table is an adjusted or updated allocation.

It is further observed that in each of the tables there is a distinct "separateness" or division between construction and OM & R costs. It appears logical that in formulating a "Suggested Basis of Agreement" the construction aspect could be predicted with greater certainty. The physical plans and designs were made, and reasonably accurate and valid estimates could be projected. There would be a minimum of variables and thus a fixed percentage for allocation of the construction costs would be feasible. The summary judgment record indicates that much negotiation was necessary concerning the construction aspect of the project. However, all parties are agreed on that allocation, and it is obvious that it was necessary and proper that such matter be determined before contracts could be consummated. The operational and maintenance (including repairs) aspect, by its very nature has more variables and it appears that a general plan, as of August 8, 1960, would be appropriate. It must be remembered that as of the date of the resolution of the actual allocation of "Operation, Maintenance and Replacement Costs," insofar as use of facilities by the various cities was concerned, was several years away. Thus, it appears reasonable, as of August 6, 1960, to provide as a "Suggested Basis of Agreement" for a general plan flexible to adjust the operation and maintenance expenses year by year after the project was placed in operation with each city pay-ing as its share the proportionate amount of the project water delivered to it.

The record shows that the documentary development of the August 8, 1960 resolution includes a compact entered into on May 27, 1960, between the Cities of Amarillo and Lubbock pertaining to the Canadian River project which provided for the distribution of operation and maintenance costs on the basis of the "use of facilities" method, which was presented to the Board of Directors on June 6, 1960, along with a tabulation dated June 1, 1960, showing the estimated cost distribution among the member cities based on the compact. There was additional bargaining and compromising with respect to the distribution of construction costs after the June 6, 1960 meeting which resulted in a new construction cost distribution found in the table designated as "July 11, 1960 Adjusted Allocation" on the attachment to the August 8, 1960 resolution. The other cities agreed to the basis of agreement suggested in the July 11, 1960 adjusted allocation. Also, all of the estimates of operation and maintenance costs in both the 1958 and 1960 tables were distributed on the basis of and demonstrated the "use of facilities" method which, according to the record, is a system of cost accounting used to determine the cost of delivery of water to each city.

■ The appellees take the position that the documentary or legislative history or background should not be considered because the resolution is clear and unambiguous in that it incorporates only the construction repayment percentages set out in the tabulation attached to resolution as the basis for distribution of operation and maintenance costs. The cases cited and relied upon by the appellees deal with clear and unambiguous statutes rather than a situation analogous to that involved in the case at bar. Since we have held that the resolution incorporates the entire tabulation, and not just the construction percentages, the resolution which integrates the tabulation when viewed from its "four corners," would be regarded as ambiguous,

and it is proper to resort to legislative history to ascertain the true intent and meaning of the resolution. San Antonio General Drivers, Helpers Local No. 657 v. Thornton, 156 Tex. 641, 299 S.W.2d 911 (1957); Red River Nat. Bank v. Ferguson, 109 Tex. 287, 206 S.W. 923 (1918). All parts of the resolution including the tabulation made an integral part thereof are to be harmonized if possible and given meaning. Martin v. Sheppard, 129 Tex. 110, 102 S.W.2d 1036 (1937); Lacy v. State Banking Board, 118 Tex. 91, 11 S.W.2d 496 (1928).

■ Although the August 8, 1960 resolution may be regarded as ambiguous, the intent of the resolution with respect to the distribution of operation and maintenance cost among the cities is clear in the light of the legislative history of the resolution and subsequent actions of the Board of Directors. When so viewed, it is apparent that the intent of the August 8, 1960 resolution was that the operation and maintenance costs be distributed among the cities by the "use of facilities" method which allocates costs on the basis of cost of delivery of project water to each respective city. Also, this method of distribution of operation and maintenance costs is the system provided for making such charges under the water supply contracts.

■ The recorded proceedings and documents in the record submitted support the conclusion that the parties beginning in 1958 through the consummation of the water supply contracts in 1961 used the term "share" and "proportionate share" to mean a share based on the water allocations and portion of facilities used in delivery of the water, which is the cost distributable to the city by the use of facilities method. The common meaning given by the parties of the term "share" and "proportionate share" should serve as a proper guide in determining the meaning of the resolution and the subsequent contractual provisions with respect to operation and maintenance costs.

The operations and maintenance costs are based upon a "pricing formula" designated and demonstrated in the Bureau of Reclamation study by the use of facilities approach, following a general system that had been discussed in preliminary negotiations, whereby each city would pay its share of the cost of delivering water to that city, estimated, budgeted for and adjusted annually on the basis of exact costs. This procedure involved various follow-up administrative determinations by the Board pursuant to the overall requirements under the contracts to meet obligations under the Authority's contract with the United States Government.

■ Finally, as clearly shown by the heading, "Suggested Basis of Agreement" in the portion of the tabulation attached to and made a part of the resolution for all purposes, it is our opinion that the Board's actions on August 8, 1960, were to agree on the basic principles that would be integrated into the formal written contracts for water sales as required by Section 15(e) of Article 8280-154. The final agreement of the parties is incorporated in the water supply contracts as approved by the electorate of the respective cities and as unanimously approved by the Board of Directors on January 9, 1960, and on September 11, 1961. The contracts are between two separate entities, and the Authority is exercising its statutory power to conduct business by contract. Further, the bilateral water supply contracts fixing the price of water services in conformity with Section 15(e) of Article 8280-154 are to be construed in accordance with the rules of contract construction. City of Big Spring v. Board of Control, 404 S.W.2d 810 (Tex. 1966); City of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515 (Tex. 1968). Under application of proper rules of construction, which includes the undisputed documentary background and circumstances under which the contracts were made, it is evident that paragraph 4.b of the water supply contracts requires opera-

tion and maintenance costs to be distributed among the member cities upon the basis of cost required to deliver water to each particular city.

It is significant that the contracts made pursuant to the resolution follow the same general form and content of the "Suggested Basis of Agreement" i. e., construction costs, set out in paragraph 3, based on the assigned percentages contained in the "Percent of Actual Construction Costs to be Assumed by Project Cities"; and Operation and Maintenance costs set out in paragraph 4, providing, in effect, that each city should bear its proportional share of the cost of delivering water to the project cities. There is no language in the resolution or in the portion of the contracts dealing with operation and maintenance costs in any way connecting those costs to the construction costs percentages separately set out in the resolution or applied in paragraph 3 of the contracts. The language dealing with operation and maintenance costs in the "Suggested Basis of Agreement" or in the contract is in nowise related to the construction percentage tables and is harmonious with an interpretation that each city must pay the costs incurred in delivering water to it. This would be its "proportional" share of the total costs. While neither the portion of the "Suggested Basis of Agreement" relating to operation and maintenance costs nor paragraph 4 of the contracts contains numerical percentages, the provisions, in effect, establish in each instance that an individual city's portion of operation and maintenance costs would be the cost required to deliver water to that city as a percentage of the total operation and maintenance cost to all cities.

■ It is undisputed that the whole system was to be built for the Authority with funds advanced by the United States Government which were to be repaid by the Authority out of revenues to be collected from sales of water services by it to the member cities and other water purchasers. It is clear that the contractual obligation of the Authority is payable wholly or partially from revenues and thus is a type of contract to which Section 15(e) is applicable. It is correct that Section 13(p) authorizes the Authority to enter into water supply contracts with cities which, of course, would authorize the inclusion of rates as a necessary term of the contract. However, Section 15(e) dealing with situations where bonds or any other contract · payable wholly or partially from revenues employed mandatory language regarding the duty of the Board of Directors "to fix by contract with all cities, persons . . . or public agencies which may contract with it for a water supply or water facilities, such rates or compensation for water sold and services rendered by the District [Authority] as will be sufficient to pay the expenses of operating and maintaining the District [Authority] and its facilities and to pay, as they mature, all such *obligations incurred by it . . . as may* be provided for the bonds or other contracts under the terms thereof, and as may be provided in the Board of Directors' resolution pertaining thereto." Further, we find no conflict between Section 13(*o*) and Section 15(e) as contended by the appellees. Section 13(*o*) provides that "charges and rates for water services . . . shall be fixed only by unanimous vote of the members of the Board of Directors." This requirement that rates be fixed by unanimous vote is in no way inconsistent with the mandate of Section 15(e) that the rate be fixed by contract. Further, we find no conflict between Article 1109e and Section 15(e) of Article 8280–154 as contended by the appellees. Article 1109e authorizes the Board to increase the contract rates for water services if necessary to meet the expenses and obligations of the Authority. Also, this authority to make rate increases for such purposes is recognized in paragraph 13 of the Authority—City contracts. The fact that the Board may increase rates for water services under certain limited circumstances recognized in the contracts and Article 1109e does not conflict with the requirement of

Section 15(e) that the rates be fixed by contract.

■ Further, subsequent interpretations of the Board of its own contracts and resolutions are entitled to great weight. Stanford v. Butler, 142 Tex. 692, 181 S. W.2d 269 (1944). In the instant case, the Board fixed the system of charges and rates by contractual provisions and approved the contracts by unanimous vote. Section 5 of the statute was correctly applied when the Board of Directors took official action and authorized by resolution the execution of the water supply contracts between the Authority and the cities. These contracts were specifically validated by final judgment of the District Court of Travis County, Texas, in Cause No. 120,689, styled Ex Parte The Canadian River Water Authority. In these contracts so validated the rates and charges for construction repayment were fixed by Section 3 of the Authority contracts, and operation and maintenance rates and charges were fixed by Section 4 of such contracts.

Since the Authority began operation, all final distributions of operation and maintenance costs have been on the basis of cost of delivery of water to each city determined in a manner consistent with the "use of facilities" method, as demonstrated by the Board's discretionary actions in adopting budgets and allocating costs. Budget making and cost allocation of operation and maintenance costs are the administrative responsibilities and functions of the Board in carrying out the system established by the contracts made pursuant to the entire "Suggested Basis of Agreement" adopted by the August 6, 1960 resolution, which includes not only an allocation of construction costs on fixed percentages, but also a provision to the effect, when reasonably construed, that each city shall bear its propotionate share of the total operational and maintenance costs of delivering water to that particular city. In view of the foregoing, it appears that the summary judgment requiring an inflexible or "fixed" distribution of operation and maintenance costs among the member cities without regard to the quantity of water received and the actual cost of delivery is inconsistent with the expressed intention and subsequent actions of all parties to the suit.

The provisions in the water supply contracts requiring that operation and maintenance charges shall be distributed on the basis of the cost required to deliver water to each individual city are consistent with the general language contained in the portion of the "Suggested Basis for Agreement" in the August 8, 1960 resolution and its attached tabulation regarding allocation of operation and maintenance costs. Thus, it appears that a system was formulated whereby the August 8, 1960 resolution and its attached tabulation, incorporated for all purposes, set out the general basis for allocation of operation and maintenance costs. This was followed by the specific contracts and administratively implemented by the various actions of the Board from time to time.

Further, it is our opinion that budget making and cost allocations are functions and responsibilities of the Board which involve a determination of the ultimate charges to the cities for water services. This system of charges is established by the contracts approved by the unanimous action of the Board pursuant to the above discussed statutory mandates and requirements of the enabling act. Thus, the August 8, 1960 resolution was not within itself effective to set rates. Rather, the Board fixed the rates by contract and the administrative actions of the Board should be consistent with the principles of the August 6, 1960 resolution and the specific contracts to the end that operation and maintenance costs shall be allocated in proportion to actual cost of delivering project water to the respective project cities.

The scope of this appeal is limited to the declaratory judgment aspect of the case relative to the system which should be followed, and we do not pass upon any discretionary or administrative action of the Board to determine whether it was within

the framework of the system declared. Further, we do not deal with any accounting matter for these have been severed by the trial court for determination in another action.

After considering the pertinent statutory enactments, the summary judgment evidence, the various briefs, arguments and authorities submitted, we sustain the appellants' points of error. Accordingly, the judgment of the trial court granting the appellees' motion for summary judgment and overruling appellants' motion is reversed; the appellees' motion for summary judgment is overruled and the appellants' motion for summary judgment is granted; and declaratory judgment is hereby rendered that as a matter of law the proper method for distribution of operation and maintenance costs for member cities of the Authority is that each city be charged for the actual cost of delivery of water to that city. Rule 434, Texas Rules of Civil Procedure.